## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JOE FINCHER,** | |
| *Plaintiff,* | **MDL No. 3:21-md-3004-NJR** |
| **v.** | **Case No. 3:25-pq-00113** |
| **SYNGENTA CROP PROTECTION, LLC, SYNGENTA AG, and CHEVRON U.S.A., INC.,** | **COMPLAINT FOR DAMAGES** |
| | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

## COMPLAINT

NOW COMES Plaintiff JOE FINCHER, by and through their attorneys, NIGH GOLDENBERG RASO & VAUGHN, PLLC, and for their Complaint at Law against Defendants, SYNGENTA CROP PROTECTION, LLC, SYNGENTA AG, and CHEVRON U.S.A., INC., alleges as follows:

### I.    SUMMARY OF THE CASE

1. Paraquat is a synthetic chemical compound[1] that since the mid-1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("Paraquat") developed, registered, formulated, distributed, and sold for use in the United States, including the state of Plaintiff's residence.

2. Defendants are companies and successors-in-interest to companies that manufactured, distributed, and sold Paraquat for use in the state of Plaintiff's residence, acted in concert with others who manufactured, distributed, and sold Paraquat for use in the state of

---

[1] Paraquat dichloride (EPA Pesticide Chemical Code 061601) or Paraquat methosulfate (EPA Pesticide Chemical Code 061602).

Plaintiff's residence, sold and use Paraquat in the state of Plaintiff's residence, or owned property in the state of Plaintiff's residence where Paraquat was used.

3. Plaintiff bring this suit against Defendants to recover damages for personal injuries resulting from Plaintiff JOE FINCHER's exposure to Paraquat over many years at various places in the state of Plaintiff's residence.

## II.    PARTIES

### A.  Plaintiff

4. Plaintiff JOE FINCHER is a citizen and resident of the state of Oklahoma who suffers from Parkinson's disease ("PD") caused by exposure to Paraquat while working as a mixer and applicator on a family farm in Loves Valley, Oklahoma.

### B.  Defendants

5. Defendant Syngenta Crop Protection, LLC ("SCP") is a Delaware limited liability company with its principal place of business at 410 South Swing Road, Greensboro, North Carolina 27409. SCP is a subsidiary of Syngenta Seeds, and is a wholly owned subsidiary of Defendant Syngenta AG.

6. Defendant Syngenta AG ("SAG") is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business at Schwazwaldallee 215, 4058 Basel-Stadt, Switzerland. SAG wholly owns, through its ownership of Syngenta Seeds, Defendant SCP.

7. Defendant Chevron U.S.A., Inc. ("CUSA") is a Pennsylvania corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583.

## III.    JURISDICTION AND VENUE

### A.  Subject Matter Jurisdiction

8. This court has subject matter jurisdiction over this action because complete diversity exists under 28 U.S.C. § 1332(a)(3).

9. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Plaintiff seeks an amount that exceeds this sum or value on each of his claims against each Defendant.

10. Complete diversity exists because this is an action between citizens of different states in which a citizen or subject of a foreign state is an additional party, in that:

   a. Plaintiff is a citizen of the state of Oklahoma;

   b. SCP is a citizen of the states of Delaware and North Carolina;

   c. CUSA is a citizen of the states of Pennsylvania and California;

   d. SAG is a citizen or subject of the nation of Switzerland.

**B. Personal Jurisdiction**

11. This Court has personal jurisdiction over SCP because SCP is a corporation doing business within the state of plaintiff's residence. SCP previously sold and continues to sell its Paraquat products throughout the state of plaintiff's residence. In addition, SCP maintains sufficient minimum contacts with the state of plaintiff's residence such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice. Specific to this case, SCP engaged in the business of developing, manufacturing, testing, packaging, marketing, distributing, and labeling pesticides containing Paraquat in the state of plaintiff's residence and the surrounding states, as such that filing a lawsuit by a person injured by Paraquat in the state of plaintiff's residence foreseeable. SCP purposefully availed itself of the privilege of

conducting activities within the state of plaintiff's residence, thus invoking the benefits and protections of its laws.

12. This Court has personal jurisdiction over SAG because, for the reasons alleged above, the jurisdictional contact of SCP in this state are attributable to SAG given the unusually high degree of control SAG exercises over its subsidiaries. In addition, SAG and SCP acted in concert under agreements or other arrangements to act in a collective manner and/or as joint venturers regarding the actions and events made the subject of this Complaint. SAG and SCP are therefore jointly and severally liable for the acts for which the Plaintiff complains.

13. In the 2011 case of *City of Greenville, Illinois. v. Syngenta Crop Protection, Inc.,* this Honorable Court held that SAG's unusually high degree of control made SCP the agent or alter ego of SAG, and therefore subjected SAG to jurisdiction in the state of Illinois. 830 F. Supp. 2d 550 (S.D. Ill. 2011).

14. This Court has personal jurisdiction over CUSA because CUSA advertises and sells goods, specifically pesticides containing Paraquat, throughout the state of plaintiff's residence. It derived substantial revenue from goods and products used in this District. It expected its acts to have consequences within the state of plaintiff's residence, including the foreseeable possibility of a lawsuit by a person injured by Paraquat in the state of plaintiff's residence, and derived substantial revenue from interstate commerce. CUSA purposefully availed itself of the privilege of conducting activities within the state of plaintiff's residence, thus invoking the benefits and protections of its laws.

**C. Venue**

15. Venue is proper in this District pursuant to the Judicial Panel on Multidistrict Litigation's Transfer Order[2] and the subsequently entered Case Management Order No. 1, authorizing direct filing. Absent consolidation, venue would otherwise be proper in the District of Oklahoma.

**D.  Statute of Limitations**

16. Plaintiff had no knowledge and had no way of acquiring knowledge about the risk of serious illness associated with exposure to Paraquat.

17. Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Paraquat is injurious to human health.

18. Plaintiff had no information which would cause a reasonable person to suspect the risks associated with exposure to Paraquat; nor would a reasonable and diligent investigation by Plaintiff have led to a discovery that Paraquat would cause or had caused Plaintiff's injuries.

19. Defendants failed to disclose critical safety information about their product Paraquat, and instead consistently made false representations as to the safety of Paraquat, and those false representations prohibited Plaintiff from discovering valuable information which would have prevented this claim.

20. Defendants were under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Paraquat.

---

[2]    https://www.ilsd.uscourts.gov/documents/Paraquat/3004InitialTransferOrder.pdf

21. Defendants knowingly, affirmatively, and actively concealed safety information concerning Paraquat, and the serious risks associated with the use of and/or exposure to their products, including Paraquat.

### IV.    ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

#### A.  Defendants and their Predecessors

##### 1.    Syngenta Crop Protection LLC and Syngenta AG

22. In 1926, four British chemical companies merged to create the British company that was then known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI").

23. In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the state of Delaware, which at various times was known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc., and ultimately was known as ICI Americas Inc. (collectively, "ICI Americas").

24. In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a wholly owned British subsidiary known as Plant Protection Ltd., and later as a division within ICI, into a wholly owned British subsidiary known as ICI Bioscience Ltd.

25. In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

26. As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same

or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC.

27. Before ICI's demerger and creation of the Zeneca Group, ICI had a Central Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

28. As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

29. After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety studies that were submitted to the EPA to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

30. As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the state of Delaware.

31. In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

32. As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the state of New York, was merged into or continued its business under the same or similar

7

ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the state of Delaware.

33. In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly owned subsidiaries.

34. In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant SAG as the ultimate parent company.

35. As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SAG.

36. As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.

37. Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others to perform health and safety studies for submission to the EPA to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

38. As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their business under the same or similar ownership and management, as Syngenta Crop

Protection, Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the state of Delaware.

39. In 2010, SCPI was converted into Defendant SCP, a wholly owned subsidiary of SAG organized and existing under the laws of the state of Delaware with its principal place of business in Greensboro, North Carolina.

40. SAG is a successor in interest to the crop-protection business of its corporate predecessor Novartis AG.

41. SAG is a successor in interest to the crop-protection business of its corporate predecessor AstraZeneca PLC.

42. SAG is a successor in interest to the crop-protection business of its corporate predecessor Zeneca Group PLC.

43. SAG is a successor in interest to the crop-protection business of its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

44. SAG is a successor in interest to the crop-protection business of its corporate predecessor ICI Bioscience Ltd.

45. SAG is a successor in interest to the crop-protection business of its corporate predecessor Plant Protection Ltd.

46. SCP is a successor in interest to the crop-protection business of its corporate predecessor SCPI.

47. SCP is a successor in interest to the crop-protection business of its corporate predecessor NCPI.

48. SCP is a successor in interest to the crop-protection business of its corporate predecessor Ciba-Geigy Corporation.

49. SCP is a successor in interest to the crop-protection business of its corporate predecessor Zeneca Inc.

50. SCP is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

51. SCP is registered to do business in the state of Plaintiff's residence.

52. SCP does substantial business in the state of Plaintiff's residence; specifically, it:

    a. markets, advertises, distributes, sells, and delivers Paraquat and other pesticides to distributors, dealers, applicators, and farmers in the state of Plaintiff's residence;

    b. secures and maintains the registration of Paraquat and other pesticides with the EPA to enable itself and others to manufacture, distribute, sell, and use these products in the state of Plaintiff's residence; and,

    c. performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the state of Plaintiff's residence.

53. SAG was a publicly traded company on the Swiss stock exchange; American Depositary Receipts for SAG were traded on the New York Stock Exchange until it was acquired by ChemChina, a Chinese state-owned entity, in 2017. It has since been de-listed. On information and belief, SAG continues to operate as a separate unit of ChemChina.

54. SAG is a management holding company.

55. Syngenta Crop Protection AG ("SCPAG"), a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries.

56. SCPAG employs the global operational mangers of production, distribution and marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Division.

57. The Syngenta Group's CP and Seeds Divisions are the business units through which SAG manages its CP and Seeds product lines.

58. The Syngenta Group's CP and Seeds Divisions are not and have never been corporations or other legal entities.

59. SCPAG directly and wholly owns Syngenta International AG ("SIAG").

60. SIAG is the "nerve center" through which SAG manages the entire Syngenta Group.

61. SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

62. SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

63. Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

64. SAG is the indirect parent of SCP through multiple layers of corporate ownership:

    a.  SAG directly and wholly owns Syngenta Participations AG;

    b.  Syngenta Participations AG directly and wholly owns Seeds JV C.V.,;

    c.  Seeds JV C.V. directly and wholly owns Syngenta Corporation,

    d.  Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC;

    e.  Syngenta Seeds, LLC directly and wholly owns SCP.

65. Before SCPI was converted to SCP, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.

66. SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

67. SAG has purposefully organized the Syngenta Group, including SCP, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

68. Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCP, through a "matrix management" system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

69. The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.

70. SAG controls the actions of its far-flung subsidiaries, including SCP, through this global "functional" management structure.

71. SAG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SCP.

72. The SEC consists of the CEO and various global Heads, which currently are:

    a.  The Chief Executive Officer;

    b.  Group General Counsel;

    c.  The President of Global Crop Protection;

    d.   The Chief Financial Officer;

    e.   The President of Global Seeds; and

    f.   The Head of Human Resources;

73. SIAG employs all of the members of the Executive Committee.

74. Global Syngenta Group corporate policies require SAG subsidiaries, including SCP, to operate under the direction and control of the SEC and other unincorporated global management teams.

75. SAG's board of directors meets five to six times a year.

76. In contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SCP.

77. Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members.

78. Since SCPI became SCP, decisions that are normally made by the board or managers of SCP in fact continue to be directed by the SEC or other Syngenta Group global or regional managers.

79. Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the discretion of the SEC or other Syngenta Group global or regional managers.

80. Since SCPI became SCP, the appointment and removal of the manager(s) of SCP continues to be directed by the SEC or other Syngenta Group global or regional managers.

81. The management structure of the Syngenta Group's CP Division, of which SCP is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

82. Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and functions), which includes the President of Global Crop Protection, the CP region Heads (including SCP President Vern Hawkins), and various global corporate function Heads.

83. The CP Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

84. Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Group's U.S. and Canadian CP business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).

85. The North America Regional Leadership Team is chaired by SCP's president and includes employees of SCP and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

86. The Syngenta Group's U.S. and Canadian CP companies, including SCP, report to the North America Regional Leadership Team, which reports to the CP Leadership Team, which reports to the SEC, which reports to SAG's board of directors.

87. Some members of the North America Regional Leadership Team, including some SCP employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.

88. Syngenta Group's global Heads that supervise SCP employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

89. The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCP, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.

90. SCP performs its functions according to its role in the CP Division structure:

    a. CP Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

    b. New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP Division;

    c. These products are then tested by other Syngenta Group companies, including SCP, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

    d. Syngenta Group companies, including SCP, do not contract with or compensate each other for this testing;

e.   Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f.   If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SCP, decide whether to sell the product;

g.   Decisions to sell the product must be approved by the SEC; and

h.   The products that are sold all bear the same Syngenta trademark and logo.

91. SCP is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies.

92. These "reserved powers" require Syngenta Group companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure.

93. For example, although SAG permits Syngenta Group companies to handle small legal matters on their own, under the "reserved powers" system, SAG's board of directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SCP, if their value exceeds an amount specified in the "reserved powers."

94. Similarly, the appointments of senior managers at SCP must be approved by higher levels than SCP's own management, board of directors, or even its direct legal owner.

95. Although SCP takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

96. Although SAG subsidiaries, including SCP, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.

97. SAG and the global management of the Syngenta Group restrict the authority of SCP to act independently in areas including:

   a.  Product development;

   b.  Product testing (among other things, SAG and the global management of the Syngenta Group require SCP to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCP submits to the EPA in support of the registrations of Paraquat and other pesticides);

   c.  Production;

   d.  Marketing;

   e.  Sales;

   f.  Human resources;

   g.  Communications and public affairs;

   h.  Corporate structure and ownership;

   i.  Asset sales and acquisitions;

   j.  Key appointments to boards, committees and management positions;

   k.  Compensation packages;

   l.  Training for high-level positions; and

   m.  Finance (including day-to-day cash management) and tax.

98. Under the Syngenta Group's functional management system, global managers initiate and the global Head of Human Resources oversees international assignments and

17

compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.

99. Under this international assignment program, at the instance of Syngenta Group global managers, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SCP.

100. The Syngenta Group's functional management system includes a central global finance function – known as Syngenta Group Treasury – for the entire Syngenta Group.

101. The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SAG's subsidiaries, including SCP, to the interests of the Syngenta Group as a whole.

102. Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SCP, holds the cash on account, and lends it to other subsidiaries that need liquidity.

103. The Syngenta Group's global treasury policy does not allow SAG subsidiaries, such as SCP, to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

104. Syngenta Group Treasury also decides whether SCP will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

105. SCP's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

106. In 2011, the U.S. District Court for the Southern District of Illinois held that SAG's unusually high degree of control over SCP made SCP the agent or alter ego of SAG. *See City of Greenville, Ill. v. Syngenta Crop Protection, Inc.,* 830 F. Supp. 2d 550 (S.D. Ill. 2011).

107. SAG continues to exercise the unusually high degree of control over SCP that led the District Court to find in 2011 that SAG was subject to jurisdiction in the state of Tennessee.

108. SAG, through its agent or alter ego, SCP, does substantial business in the state of Plaintiff's residence, in the ways previously alleged as to SCP.

### 2. Chevron Entities

109. Chevron Chemical Company ("Chevron Chemical") was a corporation organized in 1928 under the laws of the state of Delaware.

110. In 1997, Chevron Chemical was merged into Chevron Chemical Company LLC ("Chevron Chemical LLC"), a limited liability company organized under the laws of the state of Delaware.

111. In the mid-2000s, Chevron Chemical LLC was merged into or continued to operate under the same or similar ownership and management as Chevron Phillips Chemical Company LP ("CP Chemical"), a limited partnership organized and existing under the laws of the state of Delaware with its principal place of business in The Woodlands, Texas.

112. CP Chemical is a successor in interest to the crop-protection business of its corporate predecessor Chevron Chemical LLC.

113. CP Chemical is a successor by merger or continuation of business to its corporate predecessor Chevron Chemical.

114. Defendant Chevron U.S.A. Inc. ("CUSA") is a corporation organized and existing under the laws of the state of Pennsylvania, with its principal place of business in the state of California.

115. Defendant CUSA is a successor in interest to the crop-protection business of its corporate predecessor Chevron Chemical LLC.

116. Defendant CUSA is a successor in interest to the crop-protection business of its corporate predecessor CP Chemical.

117. CUSA is registered to do business in the state of Plaintiff's residence.

118. In the mid-2000s, CUSA entered into an agreement in which it expressly assumed the liabilities of Chevron Chemical and Chevron Chemical LLC arising from Chevron Chemical's then-discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing, and sale of Paraquat products in the United States as alleged in this Complaint.

**B. Paraquat Manufacture, Distribution, and Sale**

119. ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of Paraquat in 1955.

120. The leading manufacturer or Paraquat is Syngenta, which (as ICI) developed the active ingredient in Paraquat in the early 1960s.

121. ICI produced the first commercial Paraquat formulation and registered it in England in 1962.

122. Paraquat was marketed in 1962 under the brand name Gramoxone.

123. Paraquat first became commercially available for use in the United States in 1964.

124. In or about 1964, ICI and Chevron Chemical entered into agreements regarding the licensing and distribution of Paraquat ("the ICI-Chevron Chemical Agreements").

125. In or about 1971, ICI Americas became a party to the ICI-Chevron Chemical Agreements on the same terms as ICI.

126. The ICI-Chevron Chemical Agreements were renewed or otherwise remained in effect until about 1986.

127. In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical to formulate or have formulated, use, and sell Paraquat in the United States and to grant sub-licenses to others to do so.

128. In the ICI-Chevron Chemical Agreements, Chevron Chemical granted ICI and ICI Americas a license to its patents and technical information to permit ICI and ICI Americas to formulate or have formulated, use, and sell Paraquat throughout the world and to grant sub-licenses to others to do so.

129. In the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical agreed to exchange patent and technical information regarding Paraquat.

130. In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical exclusive rights to distribute and sell Paraquat in the United States.

131. In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to distribute and sell Paraquat in the U.S. under the ICI-trademarked brand name Gramoxone.

132. ICI and ICI Americas and Chevron Chemical entered into the ICI-Chevron Chemical Agreements to divide the worldwide market for Paraquat between them.

133. Under the ICI-Chevron Chemical Agreements, Chevron Chemical distributed and sold Paraquat in the U.S. and ICI and ICI Americas distributed and sold Paraquat outside the United States.

134. Under the ICI-Chevron Chemical Agreements and related agreements, both ICI and ICI Americas and Chevron Chemical distributed and sold Paraquat under the ICI-trademarked brand name Gramoxone.

135. Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical exchanged patent and technical information regarding Paraquat.

136. Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas provided to Chevron Chemical health and safety and efficacy studies performed or procured by ICI's Central Toxicology Laboratory, which Chevron Chemical then submitted to the USDA and the EPA to secure and maintain the registration of Paraquat for manufacture, formulation, distribution, and sale for use in the United States.

137. Under the ICI-Chevron Chemical Agreements and related agreements, ICI and ICI Americas manufactured and sold Paraquat to Chevron Chemical that Chevron Chemical then distributed and sold in the United States, including in the state of Plaintiff's residence, where Chevron Chemical marketed, advertised, and promoted them to distributors, dealers, applicators, and farmers.

138. Under the ICI-Chevron Chemical Agreements and related agreements, Chevron Chemical distributed and sold Paraquat in the United States under the ICI-trademarked brand name Gramoxone and other names, including in the state of Plaintiff's residence, where Chevron Chemical marketed, advertised, and promoted them to distributors, dealers, applicators, and farmers.

139. SAG and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold Paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their Paraquat products to be distributed and sold in the state of Plaintiff's residence, where they marketed, advertised, and promoted them to distributors, dealers, applicators, and farmers.

140. SAG and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of Paraquat for manufacture, formulation, distribution, and sale for use in the United States from about 1964 through the present.

141. SCP and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold Paraquat for use in the United States from about 1971 through the present, and at all relevant times intended or expected their Paraquat products to be distributed and sold in the state of Plaintiff's residence, where they marketed, advertised, and promoted them to distributors, dealers, applicators, and farmers.

142. SCP and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of Paraquat for manufacture, formulation, distribution, and sale for use in the United States from about 1971 through the present.

143. Chevron Chemical manufactured, formulated, distributed, and sold Paraquat for use in the United States from about 1964 through at least 1986, acting in concert with ICI and ICI Americas throughout this period, including in the state of Plaintiff's residence, where

Chevron Chemical marketed, advertised, and promoted them to distributors, dealers, applicators, and farmers.

144. Between approximately 1985 and 1988, Plaintiff Joe Fincher was repeatedly exposed to and inhaled, ingested, or absorbed Paraquat in the court of applying it to vegetation.

145. Plaintiff was diagnosed with PD in or about 2022.

146. No doctor or any other person told Plaintiff that his Parkinson's disease was or could have been caused by exposure to Paraquat.

147. Plaintiff had never read or heard of any articles in newspapers, scientific journals, or other publication that associated Parkinson's disease with Paraquat.

148. Plaintiff had never read or heard of any lawsuit alleging that Paraquat causes Parkinson's disease.

149. At no time when using Paraquat himself was Plaintiff aware that exposure to Paraquat could cause any latent injury, including any neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to Paraquat.

150. The Paraquat to which Plaintiff was exposed, was sold and used in the state of Plaintiff's residence, and was manufactured, distributed, and on information and belief sold by one or more of the Defendants and their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in the state of Plaintiff's residence.

151. On information and belief, Plaintiff was exposed to Paraquat manufactured, distributed, and sold at different times as to each Defendant, its corporate predecessors, and others with whom they acted in concerns, and not necessarily throughout the entire period of his

exposure as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert.

152. On information and belief, Plaintiff was exposed to Paraquat that was sold and used in the state of Plaintiff's residence, and was manufactured, distributed, and sold by SCP, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending or expecting that it would be sold and used in the state of Plaintiff's residence.

153. On information and belief, Plaintiff was exposed to Paraquat that was sold and used in the state of Plaintiff's residence, and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending or expecting that it would be sold and used in the state of Plaintiff's residence.

154. On information and belief, Plaintiff was exposed to Paraquat that was sold and used in the state of Plaintiff's residence, and was manufactured, distributed, and sold by Chevron Chemical, acting in concert with ICI and ICI Americas, intending or expecting that it would be sold and used in the state of Plaintiff's residence.

**C. Paraquat Use**

155. Since 1964, Paraquat has been used in the United States to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' Paraquat for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants.

156. Each year, Paraquat is applied to millions of acres of agricultural crops, including corn, soybeans, wheat, cotton, fruit, vegetables, rice, orchards, grapes, alfalfa, hay, and other crops.

157. At all relevant times, where Paraquat was used, it was commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year. The use of Defendants' Paraquat for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants.

158. At all relevant times, Paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert was typically sold to end-users in the form of liquid concentrates (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank or a sprayer and applied by spraying it onto target weeds.

159. At all relevant times, concentrates containing Paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

160. At all relevant times, Paraquat typically was applied with a knapsack sprayer, hand-held sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor-drawn pressurized tank, and such use was as intended or directed or was reasonably foreseeable.

**D. Paraquat Exposure**

161. At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to Paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks.

162. At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who sprayed Paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to Paraquat, including as a result of spray drift, the movement or herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plaints.

163. At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to Paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared.

164. At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and

conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

165. At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via respiration into the lungs, including the deeps parts of the lungs where respiration (gas exchange) occurred.

166. At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

167. At all relevant times, it was reasonably foreseeable that Paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

168. At all relevant times, it was reasonably foreseeable that Paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

169. At all relevant times, it was reasonably foreseeable that Paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

170. At all relevant times, it was reasonably foreseeable that Paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

**E.  Parkinson's Disease**

171. PD is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

172. Scientists who study PD generally agree that fewer than 10% of all PD cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

### 1. Symptoms and Treatment

173. The characteristic symptoms of PD are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

174. PD's primary motor symptoms often result in "secondary" motor symptoms such as freezing gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

175. Non-motor symptoms – such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression – are present in most cases of PD, often for years before any of the primary motor symptoms appear.

176. There is currently no cure for PD. No treatment will slow, stop, or reverse its progression, and the treatments most-commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

### 2. Pathophysiology

177. The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of PD.

178. Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

179. The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

180. Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of PD.

181. The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of PD.

182. Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in the cells and cells' antioxidant defenses.

183. Scientists who study PD generally agree that oxidative stress is a major factor in – if not the precipitating cause of – the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of PD.

**F.  Paraquat's Toxicity**

184. Paraquat is highly toxic to both plants and animals.

185. Paraquat injures and kills plants by creating oxidative stress that causes or contributes to cause the degeneration and death of plant cells.

186. Paraquat injures and kills humans and other animals by creating oxidative stress that causes or contributes to cause the degeneration and death of animal cells.

187. Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

188. The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life – photosynthesis in the case of plant cells and cellular respiration in the case of animal cells.

189. The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids – molecules that are essential components of the structures and functions of living cells.

190. Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

191. Paraquat's redox properties have been known since at least the 1930s.

192. Paraquat is toxic to the cells of plants and animals because it creates oxidative stress through redox cycling, which has been known since at least the 1960s.

193. The surfactants with which the concentrates containing Paraquat manufactured, distributed, and sold by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated were likely to increase Paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin,

mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

**G.  Paraquat and Parkinson's Disease**

194. The same redox properties that make Paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons – Paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative stress through redox cycling.

195. Although PD is not known to occur naturally in any species other than humans, PD research is often performed using "animal models," in which scientists artificially produce in laboratory animals conditions that show features of PD.

196. Paraquat is one of only a handful of toxins that scientists use to produce animal models of PD.

197. In animal models of PD, hundreds of studies involving various routes of exposure have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human PD, and motor deficits and behavioral changes consistent with those commonly seen in human PD.

198. Hundreds of in vitro studies have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

199. Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between Paraquat exposure and PD, including multiple studies finding a two- to five-fold or greater increase in the risk of PD in

populations with occupational exposure to Paraquat compared to populations without

such exposure.

### H.  Paraquat Regulation

200. The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et

seq., which regulates the distribution, sale, and use of pesticides within the United States,

requires that pesticides be registered with the EPA prior to their distribution, sale, or use,

except as described by FIFRA. 7 U.S.C. 136a(a). 201.

201. As part of the pesticide registration process, the EPA requires, among other things, a

variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and

other potential non-target organisms, and other adverse effects on the environment.

202. As a general rule, FIFRA requires registrants to perform health and safety testing of

pesticides.

203. FIFRA does not require the EPA to perform health and safety testing of pesticides itself,

and the EPA generally does not perform such testing.

204. The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and

data submitted by the registrant, that:

   a.  its composition is such as to warrant the proposed claims for it, 7 U.S.C. §

   136a(c)(5)(A);

   b.  its labeling and other material required to be submitted comply with the

   requirements of FIFRA

   c.  it will perform its intended function without unreasonable adverse effects on the

   environment, 7 U.S.C. § 136a(c)(5)(C); and

d.  when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

205. FIFRA defines "unreasonable adverse effects on the environment'' as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

206. Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

207. However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

208. The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person . . . any pesticide which is . . . misbranded." 7 U.S.C. § 136j(a)(1)(E).

209. A pesticide is misbranded under FIFRA if, among other things:

a.  its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients that is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

b.  the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of

the title, are adequate to protect health and the environment, 7 U.S.C. §

136(q)(1)(F); or

    c.  the label does not contain a warning or caution statement that may be necessary

and if complied with, together with any requirements imposed under section

136a(d) of the title, is adequate to protect health and the environment," 7 U.S.C. §

136(q)(l)(G).

210. Plaintiff(s) do not seek in this action to impose on Defendants any labeling or packaging

requirement in addition to or different from those required under FIFRA; accordingly,

any allegation in this complaint that a Defendant breached a duty to provide adequate

directions for the use of Paraquat or warnings about Paraquat, breached a duty to provide

adequate packaging for Paraquat, or concealed, suppressed, or omitted to disclose any

material fact about Paraquat or engaged in any unfair or deceptive practice regarding

Paraquat, that allegation is intended and should be construed to be consistent with that

alleged breach, concealment, suppression, or omission, or unfair or deceptive practice,

having rendered the Paraquat "misbranded" under FIFRA; however, Plaintiff(s) bring

claims and seek relief in this action only under state law, and do not bring any claims or

seek any relief in this action under FIFRA.

## V. CLAIMS FOR RELIEF

### I.  Negligence

211. Plaintiff incorporates by reference all previous and subsequent paragraphs of this

Complaint as if fully set forth herein and further allege as follows:

212. Defendants had a duty to exercise ordinary care in the designing, researching, testing,

manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of

Paraquat products into the stream of commerce, including a duty to assure that the product would not cause those exposed to it to suffer unreasonable and dangerous side effects.

213. Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, quality assurance, quality control, and/or distribution of Paraquat products in that Defendants knew or should have known that persons foreseeably exposed to Paraquat products were placed at a high risk of suffering unreasonable and dangerous side effects, including but not limited to, the development of Parkinson's disease, as well as other severe and personal injuries that are permanent and lasting in nature; physical pain and mental anguish, including diminished enjoyment of life; and a need for lifelong medical treatment, monitoring, and medications.

214. The negligence by Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a. Manufacturing, producing, promoting, formulating, creating, and/or designing Paraquat products without thoroughly testing it;

b. Failing to test Paraquat products and/or failing to adequately, sufficiently, and properly test Paraquat products;

c. Failing to conduct sufficient testing to determine whether Paraquat products were safe for use, as Defendants either knew or should have known that Paraquat products were unsafe and unfit for use because of the dangers to those exposed to it;

d.  Failing to conduct sufficient testing and studies to determine Paraquat products' effects on human health even after Defendants had knowledge of studies linking Paraquat products to latent neurological damage and neurodegenerative disease, including Parkinson's disease;

e.  Failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Paraquat products;

f.  Failing to provide adequate cautions and warnings to protect the health of persons who would reasonably and foreseeably be exposed to Paraquat products;

g.  Negligently marketing, advertising, and recommending the use of Paraquat products without sufficient knowledge as to its dangerous propensities;

h.  Negligently representing that Paraquat products were safe for use for its intended purpose when, in fact, it was unsafe;

i.  Negligently representing that Paraquat products had equivalent safety and efficacy as other forms of herbicides;

j.  Negligently designing Paraquat products in a manner that was dangerous to others;

k.  Negligently manufacturing Paraquat products in a manner that was dangerous to others;

l.  Negligently producing Paraquat products in a manner that was dangerous to others;

m.  Negligently formulating Paraquat products in a manner that was dangerous to others;

  n. Concealing information from Plaintiff while knowing that Paraquat products were unsafe, dangerous, and/or non-conforming with EPA regulations;

  o. Improperly concealing and/or misrepresenting information from Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Paraquat products compared to other forms of herbicides; and

  p. Negligently selling Paraquat products with a false and misleading label.

215. Defendants under-reported, underestimated, and downplayed the serious dangers of Paraquat products.

216. Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Paraquat products in that Defendants:

  a. Failed to use ordinary care in designing and manufacturing Paraquat products so as to avoid the aforementioned risks to individuals when Paraquat was used as an herbicide;

  b. Failed to accompany Paraquat products with proper and/or accurate warnings regarding all possible adverse effects associated with exposure to Paraquat;

  c. Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the effects including developing Parkinson's disease;

  d. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Paraquat products;

  e. Misrepresented the evidence of Paraquat's neurotoxicity; and

  f. Was otherwise careless and/or negligent.

217. Despite the fact that Defendants knew or should have known that Paraquat products caused or could cause unreasonably dangerous health effects, Defendants continued to market, manufacture, distribute, and/or sell Paraquat products to consumers.

218. Defendants knew or should have known that consumers like Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care.

219. Defendants' negligence was the proximate cause of Plaintiff's injuries, harm, and economic loss, which Plaintiff suffered.

220. As a result of the foregoing acts and omissions, Plaintiff suffered from permanent health issues, physical disability, and mental anguish including diminished enjoyment of life, as well as financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages to exceed a sum of $75,000, together with interest, costs herein incurred, and all relief this Court deems just and proper.

## II.    Strict Products Liability (Design Defect)

221. Plaintiff incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein and further allege as follows:

222. At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, sold, and/or distributed Paraquat products as described above to which Plaintiff was exposed, including in the state of Plaintiff's residence.

223. Paraquat products were expected to and did reach the usual consumers, handlers, and person coming into contact with it without substantial change in the condition in which they were produced, manufactured, sold, distributed, and/or marketed by Defendants, including in the state of Plaintiff's residence.

224. At those times, Paraquat products were in an unsafe, defective condition that was unreasonably dangerous to users, and in particular, Plaintiff.

225. For many years, Plaintiff was exposed to Defendants' Paraquat products in the state of Plaintiff's residence regularly and repeatedly for hours at a time resulting in regular, repeated, and prolonged exposure of Plaintiff to Paraquat.

226. The Paraquat products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants were defective in design or formulation in that, when they left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of the Paraquat products.

227. The Paraquat products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants were defective in design and/or formulation, in that, when they left the hands of Defendants or their manufacturers and/or suppliers, they were unreasonably dangerous, unreasonably dangerous in normal use, and they were more dangerous than an ordinary consumer would expect. On balance, the unreasonable risks posed by Paraquat products outweighed the benefits of their design.

228. At all relevant times, Paraquat products were in a defective condition, unsafe, and unreasonably dangerous, and Defendants knew or had reason to know they were defective and unsafe, especially when used in the form and manner as intended by Defendants. In particular, the Paraquat products were defective in the following ways:

    a. Paraquat products were designed, manufactured, formulated, and packaged such that when so used, Paraquat was likely to be inhaled, ingested, and absorbed into

the bodies of persons who used them, while they were being used, or entered fields or orchards where they have been sprayed or areas near where they had been sprayed; and

b. when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely to cause or contribute to cause latent, permanent, and cumulative neurological damage, and repeated neurodegenerative disease, including Parkinson's disease to develop over time and manifest long after exposure.

229. Defendants knew or should have known that at all relevant times that their Paraquat products were in a defective condition and were (and are) unreasonably dangerous and unsafe and would create a substantial risk of harm to persons who used them, were nearby while Paraquat products were being used, or entered fields or orchards where Paraquat products had been sprayed or areas near where Paraquat products had been sprayed.

230. Armed with this knowledge, Defendants voluntarily designed their Paraquat products with a dangerous condition knowing that in normal, intended use, consumers such as Plaintiff would be exposed to it.

231. Plaintiff was exposed to Paraquat without knowledge of Paraquat's dangerous characteristics.

232. At the time of Plaintiff's exposure to Paraquat, Paraquat was being used for the purposes and in a manner normally intended, as a broad-spectrum pesticide.

233. The Paraquat products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which it was manufactured.

234. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed a defective product, which created an unreasonable risk to the consumer and to Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

235. Plaintiff could not, by the exercise of reasonable care, have discovered Paraquat's defects identified herein or perceived Paraquat's danger.

236. Defendants are thus strictly liable to Plaintiff for the manufacturing, marketing, promoting, distribution, and/or selling of a defective product.

237. Defendants' defective design of Paraquat products amounts to willful, wanton, and/or reckless conduct.

238. As a direct and proximate result of the defects in Defendants' Paraquat products were the cause or a substantial factor in causing Plaintiff's injuries.

239. As a result of the foregoing acts and omissions, Plaintiff suffered severe and personal injuries as alleged above that were permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages to exceed a sum of $75,000, together with interest, costs herein incurred, and all relief this Court deems just and proper.

### III.    Strict Products Liability (Failure to Warn)

240. Plaintiff incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein and further allege as follows:

241. Defendants engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Paraquat in the state of Plaintiff's residence, and through that conduct, have knowingly and intentionally placed Paraquat into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who was exposed to it through ordinary and reasonably foreseeable uses.

242. Defendants did in fact sell, distribute, supply, manufacture, and/or promote Paraquat products. Additionally, Defendants expected the Paraquat they were selling, distributing, supplying, manufacturing, and/or promoting to reach Plaintiff without any substantial change in the condition of the product from when it was initially distributed.

243. At the time of manufacture, Defendants knew, or in the exercise of ordinary care, should have known that:

   a.  Defendants' Paraquat products were designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of people who used it, who were nearby when it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and


   b.  when inhaled, ingested, or absorbed into the body, it was likely to cause latent neurological damage that was both permanent and cumulative, and that repeated

exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

244. At all relevant times, Defendants' Paraquat products were in a defective condition such that it was unreasonably dangerous to those exposed to them and was so at the time they were distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Paraquat was due in part to the fact that it was not accompanied by proper warnings regarding its toxic qualities and possible health effects, including, but not limited to, developing Parkinson's disease as a result of exposure. That defective condition was not a common propensity of the Paraquat products that would be obvious to a user of those products.

245. Defendants' Paraquat products did not contain a necessary warning or caution statement that, if complied with, would have been adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

246. Defendants failed to include a necessary warning or caution statement that, if complied with, would have been adequate to protect the health of those exposed.

247. Defendants could have revised Paraquat's label to provide additional warnings.

248. This defect caused serious injury to Plaintiff, who was exposed to Paraquat in its intended and foreseeable manner.

249. At all relevant times, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

250. Defendants labeled, distributed, and promoted a product that was dangerous and unsafe for the use and purpose for which it was intended.

251. Defendants failed to warn of the nature and scope of the health risks associated with Paraquat, namely its toxic properties and its propensity to cause or serve as a substantial contributing factor in the development of Parkinson's disease.

252. Defendants knew of the probable consequences of exposure to Paraquat. Despite this fact, Defendants failed to warn of the dangerous toxic properties and risks of developing Parkinson's disease from Paraquat exposure, even though these risks were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, acted with conscious disregard for Plaintiff's safety.

253. At the time of exposure, Plaintiff could not have reasonably discovered any defect in Paraquat through the exercise of reasonable care.

254. Defendants, as manufacturers and/or distributors of Paraquat, are held to the level of knowledge of an expert in the field. There was unequal knowledge with respect to the risk of harm, and Defendants, as manufacturers of Paraquat products possessed superior knowledge and knew or should have known that harm would occur in the absence of a necessary warning.

255. Plaintiff reasonably relied on the skill, superior knowledge, and judgment of Defendants.

256. Had Defendants properly disclosed the risks associated with Paraquat, Plaintiff would have taken steps to avoid exposure to Paraquat.

257. The information that Defendants provided failed to contain adequate warnings and precautions that would have enabled users to use the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Paraquat; continued to promote the efficacy of Paraquat, even after they knew or should have known of the unreasonable risks from exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Paraquat.

258. To this day, Defendants have failed to adequately warn of the true risks of exposure to Paraquat, including the risks manifested by Plaintiff's injuries associated with exposure to Paraquat.

259. As a result of its inadequate warnings, Paraquat was defective and unreasonably dangerous when it left Defendants' possession and/or control, was distributed by Defendants, and when Plaintiff was exposed to it.

260. As a direct and proximate result, Plaintiff developed and suffered severe and personal injuries that are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages to exceed the sum of $75,000, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

**IV.    Breach of Implied Warranty of Merchantability**

261. Plaintiff incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein and further allege as follows:

262. At all relevant times, Defendants were engaged in the business of selling Paraquat products and was a merchant with respect to those products.

263. At all relevant times, Defendants intended and expected that Defendants' Paraquat products would be sold and used in the state of Plaintiff's residence.

264. Defendants developed, manufactured, distributed, and sold Paraquat for use in formulating Defendants' Paraquat products, and developed, registered, formulated, and distributed Defendants' Paraquat products for sale in the United States, including the state of Plaintiff's residence.

265. Plaintiff was exposed to Defendants' Paraquat products in the state of Plaintiff's residence regularly and repeatedly, for hours at a time, resulting in regular, repeated, and prolonged exposure to Paraquat.

266. At the time of each sale of Defendants' Paraquat products that resulted in Plaintiff's exposure to Paraquat, Defendants impliedly warranted that Defendants' Paraquat products were of merchantable quality, including that they were fit for the ordinary purposes for which such goods were used.

267. Defendants breached this warranty as to each sale of Defendants' Paraquat products that resulted in Plaintiff's exposure to Paraquat, in that Defendants' Paraquat products were not of merchantable quality because they were not fit for the ordinary purpose for which such goods were used by Plaintiff who was either in direct privity with Defendants through purchase of the Paraquat products or was an employee of the purchaser to whom

the warranty was directly made and, therefore, an intended third-party beneficiary of such warranties.

268. As a direct and proximate result of the breaches of the implied warranty of merchantability by Defendants, Plaintiff suffered severe and personal injuries that were permanent and lasting in nature, physical pain and mental anguish including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages to exceed the sum of $75,000, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## JURY DEMANDED

269. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury as to all claims in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief and demands judgment against Defendants, and each of them, individually, jointly and severally at trial and request compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

A. Compensatory damages to Plaintiffs for past, present, and future damages, including, but not limited to, great pain and suffering and emotional distress and anguish, for severe and permanent personal injuries sustained by Plaintiff, health and medical care costs, together with interest and costs as provided by law;

B. For general damages in a sum exceeding this Court's jurisdictional minimum;

C.  For specific damages according to proof;

D.  For all ascertainable economic and non-economic damages according to proof in a sum exceeding this Court's jurisdictional minimum;

E.  For restitution and disgorgement of profits;

F.  For punitive and exemplary damages according to proof;

G.  For pre-judgement interest and post-judgement interest as allowed by law;

H.  For reasonable attorneys' fees;

I.  The costs of these proceedings; and

J.  For such other and further relief as this Court deems just and proper.


Dated: <u>January 28, 2025</u>                                    Respectfully submitted,

                                                                                        */s/ Marlene J. Goldenberg*
                                                                                        NIGH  GOLDENBERG  RASO  &
                                                                                        VAUGHN PLLC
                                                                                        14 Ridge Square NW ,Third Floor
                                                                                        Washington, DC 20016
                                                                                        Phone:(612)-424-9900
                                                                                        Mgoldenberg@nighgoldenberg.com

                                                                                        ***Counsel for Plaintiff***